Opinion
 

 KLEIN, P. J.
 

 After denial of her motion pursuant to Penal Code section 1538.5 to suppress evidence, defendant Carney Mae Patterson (Patterson) pleaded guilty to possessing piperidine and cyclohexanone at the same time with intent to manufacture phencyclidine (PCP) in violation of Health and Safety Code section 11383, subdivision (b). Patterson was thereupon placed on probation, one of the conditions of which being that she spend 180 days in county jail. This appeal followed.
 

 Evidence Presented at the Penal Code Section 1538.5 Hearing
 

 On November 29, 1977, James L. Segars, a narcotics investigator for the Los Angeles Police Department, received information that PCP was
 
 *459
 
 being manufactured and sold at an address on Second Avenue in the City of Los Angeles. The untested, confidential informant had observed this activity and told Segars that only a phone call was necessary to arrange for the purchase of the PCP. Later that same day, the informant placed a call to the Second Avenue address and requested two ounces of PCP with Segars listening on an extension line. A female voice gave the price at $105 per ounce, and said she would “fix it up special” for the informant to pick up right away.
 

 Officer Segars and three other police officers arrived at the address given by the informant some 10 to 15 minutes after the phone call “[t]o conduct further investigation.” The officers did not have either a search or arrest warrant. When an approximately 10-year-old child answered Segars’ knock at the door, he identified himself as a police officer conducting a narcotics investigation. Segars stood in the doorway, with his feet partially in the residence, and extended his badge through the door into the interior light for the child to see. The child said, “Okay, just a moment,” at which time defendant Patterson came out from another room. Officer Segars thereupon identified himself to Patterson as a police officer conducting a narcotics investigation, displayed his badge, and advised Patterson of the information that had been received from the informant. In response, Patterson stated, “I don’t know anything about any angel dust. Come on in.”
 

 After following Patterson into a kitchen area, Segars noticed a strong odor of ether, alcohol and other chemicals. From past experience, he formed the opinion that PCP was being manufactured on the premises and followed the odor to a service porch adjacent to the kitchen. There Segars observed tin foil, vials, a crystalline substance and several open beakers containing liquid set on top of a clothes dryer and washing machine next to a gas water heater. Segars opined that the objects he observed were being used in the three-day PCP manufacturing process. Due to the danger of explosion, Segars instructed his fellow officers to shut off the gas lines to the house. He then placed Patterson under arrest for the manufacture of PCP and advised her of her rights. Patterson stated that she understood her rights and would waive them. Segars asked for and received Patterson’s oral permission to search the house, but Patterson refused to sign a consent for the search, stating that she wanted to talk to her boyfriend first. Segars then called the fire department for help in handling the volatile chemicals. A search was conducted by Segars and the other officers, who found ether in a bedroom, paraffin in the living room and in the back of a TV set, and chemicals in the
 
 *460
 
 detached garage. At the section 1538.5 hearing, all evidence seized by the police was ruled admissible.
 

 In defense, Patterson gave a different version of what happened when the officers arrived at her home. Patterson testified that she was cooking in the kitchen when she heard a knock on the door. Her child went to answer and Patterson simultaneously called out, “Come in,” because she was expecting a friend. When she came out of the kitchen, she saw the police officers in her living room, about three feet inside the front door. The officers identified themselves and showed Patterson a badge, explaining that they were there to investigate a complaint about chemical odors. By this time, according to Patterson, the officers had begun to search the house with flashlights. She further testified that she was not placed under arrest prior to the search of the residence and denied that her permission was requested for a search. Patterson did recall being asked to sign a consent to the seizure and removal of evidence, which she stated she refused to do. Patterson also testified that she did not give permission for the search of the garage.
 

 Contentions
 

 Patterson makes the following contentions: (1) the police officers’ entry into her home violated the “knock-notice” requirements of Penal Code section 844; (2) the warrantless entry of the police into the residence violated the rule set forth in
 
 People
 
 v.
 
 Ramey
 
 (1976) 16 Cal.3d 263 [127 Cal.Rptr. 629, 545 P.2d 1333]; and (3) the warrantless search of the house and the detached garage was unlawful.
 

 For the reasons to follow, we find Patterson’s contentions to be without substantial merit and consequently affirm the judgment of the trial court.
 

 Discussion
 

 1.
 
 Asserted Violation of Penal Code Section 844
 

 Patterson contends that the entry of the officers into her home was improper due to a technical violation of the “knock-notice” requirements of Penal Code section 844, which violation she argues rendered her arrest and any consent to enter or search she may have given invalid. We disagree.
 

 
 *461
 
 Before the police may force entry into a dwelling for the purpose of making an arrest, they must, under Penal Code section 844, first (1) knock or utilize some other means reasonably calculated to alert the occupants to their presence, (2) identify themselves as police officers, and (3) explain the purpose of their demand for admittance.
 
 (Duke
 
 v.
 
 Superior Court
 
 (1969) 1 Cal.3d 314, 319 [82 Cal.Rptr. 348, 461 P.2d 628];
 
 People
 
 v.
 
 Negrete
 
 (1978) 82 Cal.App.3d 328, 335 [147 Cal.Rptr. 101].) These requirements have as their intended purposes: “(1) the protection of the privacy of the individual in his home [citations]; (2) the protection of innocent persons who may also be present on the premises where an arrest is made [citation]; (3) the prevention of situations which are conducive to violent confrontations between the occupant and individuals who enter his home without proper notice [citations]; and (4) the protection of police who might be injured by a startled and fearful householder.”
 
 (Duke
 
 v.
 
 Superior Court, supra,
 
 at p. 321;
 
 People
 
 v.
 
 Negrete, supra.)
 

 The trial court in the present case found that any deviation from the prescribed procedure, possibly occurring when Officer Segars extended his feet past the doorway to show his badge to the child in the interior light, was “minimal and served a good purpose.” It is clear that any technical trespass by Officer Segars was truly minor and in fact “avoided the various consequences that rule [Penal Code section 844] is designed to prevent.”
 
 (People
 
 v.
 
 Thompson
 
 (1979) 89 Cal.App.3d 425, 432 [152 Cal.Rptr. 495].)
 

 In addition, Patterson is precluded by her own testimony from claiming that the police entered illegally. Patterson said that when she heard the knock on her door and her child went to answer, she simultaneously called out, “Come in.” This action served to relinquish her expectation of privacy and gave evidence of her consent to peaceful entry by the police. (See
 
 People
 
 v.
 
 Gomez
 
 (1976) 63 Cal.App.3d 328, 334 [133 Cal.Rptr. 731].) Although she claims she did not know her callers were police officers and that she was expecting someone else, her lack of knowledge did not vitiate her consent.
 
 (Mann
 
 v.
 
 Superior Court
 
 (1970) 3 Cal.3d 1, 7-8 [88 Cal.Rptr. 380, 472 P.2d 468].) Once the occupant has clearly given consent to enter, even police entry by means of a ruse has been declared valid.
 
 (People
 
 v.
 
 Superior Court (Proctor)
 
 (1970) 5 Cal.App.3d 109, 114 [85 Cal.Rptr. 327].)
 

 
 *462
 
 2.
 
 Alleged Ramey Violation
 

 Starting from the premise that the police officers had probable cause to arrest her immediately after the informant had made the phone call arranging the PCP purchase, Patterson next contends that it was incumbent upon the officers, under the rule set forth in
 
 People
 
 v. Ramey,
 
 supra,
 
 16 Cal.3d 263, to obtain an arrest warrant before entering her residence. She argues that since the police officers’ entry was illegal, any evidence obtained as a result of the entry should have been suppressed as the product of an illegal arrest.
 

 Patterson’s initial premise, however, is not supported by the record. As she acknowledges, the police could not have relied in the first instance on the information supplied by the confidential informant since he was, at the time he spoke to Officer Segars, untested. There is no suggestion in the record that the informant could have been deemed a “citizen informant” whose reliability could be presumed. (See
 
 People
 
 v.
 
 Ramey, supra,
 
 at pp. 268-269.)
 

 Nor does it appear that the police had sufficient information following the monitored telephone call by the informant with which to obtain an arrest warrant. As a result of the telephone call, Officer Segars had only an unconfirmed address and a telephone contact with one of any number of unidentified females who might possibly have been involved in the PCP operation. Magistrates must observe strict standards in the issuance of warrants; even a warrant which described a suspect’s age, height, race, and color of hair has been declared invalid because such a description would fit a significant percentage of the general population
 
 (People
 
 v.
 
 Montoya
 
 (1967) 255 Cal.App.2d 137, 143 [63 Cal.Rptr. 73]).
 

 It is thus clear that further investigation by Officer Segars was mandated here before it could be said that there existed sufficient probable cause to justify the obtaining of a warrant for Patterson’s, or any other person’s, arrest. But even assuming that probable cause to arrest existed before the officers went to the suspect residence, no violation of
 
 Ramey
 
 could be said to have occurred if either (1) the entiy of the police was consensual or (2) there existed exigent circumstances making the securing of a warrant impractical.
 
 (People
 
 v.
 
 Ramey, supra,
 
 16 Cal.3d 263, 275;
 
 People
 
 v.
 
 Superior Court (Kenner)
 
 (1977) 73 Cal.App.3d 65, 68 [139 Cal.Rptr. 343].)
 

 
 *463
 
 Here, the testimony of Officer Segars was to the effect that Patterson invited the officers in after Segars had identified himself and explained that he was conducting a narcotics investigation. There is nothing in the record to indicate that the police intended to arrest Patterson immediately following the entry or that they were not prepared to discuss the matter with Patterson first in order to permit her to explain away the basis of the officers’ suspicions. (Cf.
 
 People
 
 v.
 
 Superior Court (Kenner), supra,
 
 at p. 69.) Accordingly, the warrantless entry of the officers would appear to have been consensual in nature and thus within one of the exceptions to the
 
 Ramey
 
 rule.
 

 Moreover, there was sufficient evidence of exigent circumstances presented below to bring this case within the second exception to the
 
 Ramey
 
 rule as well, which is what the trial court found in ruling on Patterson’s suppression motion. In response to a question as to why he did not attempt to secure a search warrant before proceeding to the suspect residence, Officer Segars stated: “[D]ue to the circumstances I felt that it was my duty to act promptly as I am well aware of the volatile nature of the chemical [sic] used in the manufacture of phencyclidine and felt that I had to act immediately due to the danger of explosives.”
 

 Patterson argues, however, that the evidence produced by the prosecution was inadequate to prove the existence of exigent circumstances given that Officer Segars testified that when he went to the suspect residence he “was not thoroughly sure” what stage of the PCP manufacturing process had been reached and also spoke of the potential explosion in terms of it being a “possibility.” Patterson submits that only emergencies which are imminent and assuredly about to occur can qualify as the type of exigent circumstances contemplated by
 
 Ramey.
 

 Patterson relies on the language in
 
 Ramey
 
 which defines “exigent circumstances” as meaning “an emergency situation requiring swift action to prevent imminent danger to life or serious damage to property, or to forestall the imminent escape of a suspect or destruction of evidence.”
 
 (People
 
 v.
 
 Ramey, supra,
 
 16 Cal.Sd 263, 276.) The court’s definition in
 
 Ramey,
 
 however, also included the observation that “[t]here is no ready litmus test for determining whether such circumstances exist, and in each case the claim of an extraordinary situation must be measured by the facts known to the officers.”
 
 (Ibid.)
 

 Here, the evidence disclosed that Officer Segars had been assigned to the narcotics division for eight years, had made approximately seven or
 
 *464
 
 eight arrests involving PCP manufacture, and had qualified numerous times in court as an expert witness. Because of this experience and the representation made by the unknown female voice that PCP would be made up immediately for the informant, Officer Segars formed the opinion that PCP was indeed in the process of being manufactured. Officer Segars believed that the operation had possibly reached a highly volatile point in the chemical procedure, one very vulnerable to explosion. He also formed the opinion that the operation was a sizeable one, involving various stages of PCP manufacture. Officer Segars testified that when the liquid chemical was drawn off to complete the manufacture, any replacement of that liquid could create a potentially explosive situation. He further stated that the manufacture of PCP is “one of the most dangerous operations there is.” Given his experience and expertise, it was entirely reasonable for Segars to conclude here that anyone reckless enough to manufacture PCP in the nonlaboratory conditions of a home would be careless or unknowing of the potential for spontaneous detonation, would lack the conditions and equipment necessary to prevent explosion, and would thus be without effective control over the volatile chemicals.
 

 We believe that the trial court was correct in analogizing the circumstances of the case at bench to the homemade bomb situation present in
 
 People
 
 v.
 
 Superior Court (Peebles)
 
 (1970) 6 Cal.App.3d 379 [85 Cal.Rptr. 803], In that case, the police conducted a warrantless search of the defendant’s apartment after he had been seen running from the scene of the explosion of a bomb in a college building. The court held in
 
 Peebles
 
 that, even if the pursuing officers knew that the defendant was not in his apartment such that their entry would be justified under the hot pursuit exception to the warrant requirement, the
 
 possibility
 
 of there being a bomb or dangerous bomb-making materials within the apartment constituted exigent circumstances which justified the search.
 
 (Id.,
 
 at p. 382.) The danger to the public safety posed by the PCP manufacturing in the present case appears to have been of no less degree than the danger existent in
 
 Peebles.
 

 3.
 
 The Search of the House and Garage
 

 In view of the foregoing discussion concerning the presence of exigent circumstances justifying nonconformance with the
 
 Ramey
 
 doctrine, we must conclude that the warrantless search of at least the house was likewise proper.
 
 (People
 
 v.
 
 Superior Court (Peebles), supra,
 
 6 Cal.App.3d 379, 382.) As the court in
 
 Jacobs
 
 v.
 
 Superior Court
 
 (1973) 36
 
 *465
 
 Cal.App.3d 489, 495 [111 Cal.Rptr. 449], stated: “It is well settled that emergencies of overriding magnitude may justify a search conducted without prior judicial approval.” (See also
 
 People
 
 v.
 
 Roberts
 
 (1956) 47 Cal.2d 374, 377 [303 P.2d 721].)
 

 The evidence here showed that shortly after Officer Segars entered the suspect residence at Patterson’s invitation, he became aware of the presence of an odor he associated with the manufacture of PCP.
 
 [1]
 
 Given the information Segars had previously received and his awareness of the volatile nature of the chemicals used to make PCP, it was certainly reasonable at that point for Segars to seek out the source of the odor in order to determine whether the officers and the other occupants of the house (including a child) were in danger. Once Officer Segars’ observations in the service porch confirmed that PCP was in fact being manufactured on the premises, it was then certainly reasonable for the officers to conduct a further search of the house to secure whatever additional dangerous chemicals it contained. Indeed, the record discloses that in the course of giving her oral consent to a search,
 
 [2]
 
 Patterson herself expressed fear concerning the safeness of the situation, stating that “she did not know that they [the chemicals] were dangerous” and averring that she “would never do anything to harm her children.”
 

 
 *466
 
 The same considerations would appear to obtain with respect to the search of the garage since, given the apparent size of the uncovered PCP operation, it was reasonable for the officers to assume that additional dangerous chemicals might be stored therein. As the court below noted, it “was entirely reasonable to search the garage because the same exigent circumstances that could have existed for the house would also apply to the garage.”
 

 The judgment of conviction (order granting probation) is affirmed.
 

 Allport, J., and Potter, J., concurred.
 

 Appellant’s petition for a hearing by the Supreme Court was denied August 22, 1979.
 

 [1]
 

 We note that even absent any exigent circumstances, a police officer’s detection of an odor indicating the presence of contraband may sometimes justify further investigation leading ultimately to the seizure of the contraband. (See Witkin, Cal. Evidence (1977 supp. to ch. 2) § 105A, pp. 176-180.) The applicability of this “plain smell” doctrine to the case at bench is questionable, however, since it appears to require a situation in which the odor merely confirms an officer’s observation of
 
 already visible
 
 contraband. (See
 
 People
 
 v.
 
 Cook
 
 (1975) 13 Cal.3d 663, 668-669, fn. 4 [119 Cal.Rptr. 500];
 
 Guidi
 
 v.
 
 Superior Court
 
 (1973) 10 Cal.3d 1, 20 [109 Cal.Rptr. 684, 513 P.2d 908] (conc. opn. of Mosk, J.).) In the present case. Officer Segars was not in visual contact with the contraband in the service porch when he detected the PCP odor. Nonetheless, it should be observed that in the
 
 Guidi
 
 case, our Supreme Court recognized “that the scent of contraband within a residence may well provide, of itself, probable cause to search, and
 
 when conjoined with exigent circumstances may justify a warrdntless search for and seizure of that contraband.” (Guidi
 
 v.
 
 Superior Court, supra,
 
 at p. 17, fn. 18, italics added.)
 

 [2]
 

 In view of our holding that the warrantless search herein was justified under the exigent circumstances doctrine, we need not discuss whether that search could also be validated on a consent theory. One difficulty with applying such a theory to the present case is that Officer Segars’ search of the service porch area, where much of the incriminating evidence was found, preceded his request for permission to search. In addition, there may be some question as to whether Patterson, by refusing to sign the consent to search form, had manifested an intent to withdraw her previously given oral consent to search. (But see
 
 People
 
 v.
 
 Gurtenstein
 
 (1977) 69 Cal.App.3d 441, 451 [138 Cal.Rptr. 161], holding that a refusal to sign a written consent did not act as a withdrawal of an oral consent.)