[Crim. No. 24414. July 10, 1986.]

THE PEOPLE, Plaintiff and Respondent, v.
MARK DUNCAN et al., Defendants and Appellants.

94

**COUNSEL**

Michael P. Thorman, Morris & Thorman, Bonjour, Gough & Thorman and Dennis Roberts for Defendants and Appellants.

John K. Van de Kamp, Attorney General, Herbert F. Wilkinson and Ronald E. Niver, Deputy Attorneys General, for Plaintiff and Respondent.

Ira Reiner, District Attorney (Los Angeles), Harry B. Sondheim and Eugene D. Tavris, Deputy District Attorneys, as Amici Curiae on behalf of Plaintiff and Respondent.

**OPINION**

**MOSK, J.**—Does the odor of ether and other evidence that an unlawful drug laboratory is in operation constitute exigent circumstances sufficient to justify the warrantless entry and search of a dwelling. As will appear, we conclude that such a determination must be made on a case-by-case basis and that in the case at bar the entry and search were justified.

On April 7, 1981, at approximately 12:30 p.m., Officer Steven Paulson responded to a radio call that a burglary was in progress or had just occurred. He arrived promptly at the scene and spoke to a neighbor; testimony conflicted as to whether the neighbor told him he had seen two teenagers flee with a television set.

Paulson then inspected the house assertedly being burglarized, finding the doors locked but a back window open. On the ground beneath the

window was a box containing a television set and other items. Surmising that one or more of the burglars was still inside, Paulson climbed in the open window to search for intruders. What he saw instead was, in his own words, "a lot of glassware, a couple of bags of white powder, one had . . . 'second cooking' written on it and then it had so many grams written on the package. I saw a couple of containers with ether acetate." He also observed Bunsen burners, tubing, and a piece of paper with a formula written on it pinned to the wall of an adjacent room. The room smelled strongly of ether. He suspected he had stumbled on an illicit drug laboratory.

Feeling dizzy from the odor and unsure of what to do, Paulson went into the kitchen and radioed his supervisor, Sergeant Lance House, who arrived approximately five minutes later and was let in the front door. House smelled a strong chemical odor and observed gallons of acetone, beakers, vials, and a heat lamp in operation. He had more experience with illicit drug laboratories than Paulson, and hustled the latter out of the house because he feared an explosion and knew it was unhealthy to breathe the chemical fumes. House directed Paulson to wait in a neighbor's driveway while he went to his patrol car and called vice control Officer Everett Gremminger to request his aid.

After informing Gremminger that Paulson had located a sophisticated drug laboratory with a large quantity of chemicals, House was told by a neighbor that the occupant of the dwelling was driving up in his car. House directed Paulson to the rear of the premises, where the latter observed that the box of articles was no longer present. House then knocked on the door and defendant Mark Duncan answered. When House questioned him about the burglary, Duncan stepped outside and shut the door behind him. He agreed to accompany the officers to the patrol car to give information for a burglary report.

Meanwhile, Gremminger arrived. He could smell the strong ether odor from the driveway. Paulson and House related what they had seen, but were unable to say whether any chemicals were being heated or whether the laboratory was otherwise in actual operation. Duncan refused to give any information regarding the nature of the laboratory. Gremminger then called the fire department and the federal drug enforcement agency, and entered the premises.

House directed Gremminger to the room containing the apparatus and chemicals, and Gremminger concluded it was an illicit PCP laboratory.[1] He ordered the building secured and instructed the firefighters to turn off the

[1]Gremminger was incorrect; the laboratory was in fact manufacturing methamphetamine.

gas and electricity and to ventilate the residence. He then obtained a search warrant for the house and defendant's car based on his observations and photographs. The search produced, inter alia, phenyl-2-propanone, methamphetamine, and methylamine.

Defendants[2] were charged with possession of methylamine and phenyl-2-propanone with intent to manufacture D.L. methamphetamine (Health & Saf. Code, § 11383, subd. (a)), and transportation and sale of methamphetamine (*ibid.*, § 11378). They moved to suppress the seized articles pursuant to Penal Code section 1538.5. Upon the denial of their motion they pleaded guilty to both charges. ██ They appeal from the orders placing them on conditional probation. "The order granting probation is 'deemed to be' a final judgment for the limited purpose of an appeal therefrom." (*People* v. *Cook* (1975) 13 Cal.3d 663, 667, fn. 1 [119 Cal.Rptr. 500, 532 P.2d 148]; Pen. Code, § 1237, subd. (a).)

██ Because the People concede that no warrant was issued before that obtained by Gremminger, and that the warrant resulted from the observations of the three officers inside defendants' residence, they have the burden to prove the warrantless entries were justified. (*People* v. *Hill* (1974) 12 Cal.3d 731, 753 [117 Cal.Rptr. 393, 528 P.2d 1].) ██ To meet this burden the People rely on the exigent circumstances exception to the warrant requirement. We have defined "exigent circumstances" to include "an emergency situation requiring swift action to prevent imminent danger to life or serious damage to property . . . ." (*People* v. *Ramey* (1976) 16 Cal.3d 263, 276 [127 Cal.Rptr. 629, 545 P.2d 1333].) The action must be "prompted by the motive of preserving life or property and [must] reasonably appear[] to the actor to be necessary for that purpose." (*People* v. *Roberts* (1956) 47 Cal.2d 374, 377 [303 P.2d 721].)

Thus the exigent circumstances test involves a two-step inquiry: first, factual questions as to what the officer knew or believed and what action he took in response; second, a legal question whether that action was reasonable under the circumstances. (See *People* v. *Leyba* (1981) 29 Cal.3d 591, 596-597 [174 Cal.Rptr. 867, 629 P.2d 961].) On appeal, a reviewing court must affirm the trial court's determinations of the factual questions if they are supported by substantial evidence, but must take the ultimate responsibility for deciding the legal question according to its independent judgment. (*Ibid.*) ██ "As a general rule, the reasonableness of an officer's

---

[2]It is unclear from the record precisely when defendant Edgar Corey Allard became part of this scenario. It appears from the sentencing hearing that the two defendants were together in the business of manufacturing and selling the drugs. It also appears from a neighbor's testimony at the preliminary hearing that both defendants lived at the residence in which the laboratory was located.

conduct is dependent upon the existence of facts available to him at the moment of the search or seizure which would warrant a man of reasonable caution in the belief that the action taken was appropriate. [Citation.] And in determining whether the officer acted reasonably, due weight must be given not to his unparticularized suspicions or 'hunches,' but to the reasonable inferences which he is entitled to draw from the facts in the light of his experience; in other words, he must be able to point to specific and articulable facts from which he concluded that his action was necessary." (*People* v. *Block* (1971) 6 Cal.3d 239, 244 [103 Cal.Rptr. 281, 499 P.2d 961].)

### A. *Officer Paulson*

■ The Attorney General maintains that Paulson's warrantless entry into defendants' residence was justified by the exigent circumstance of a burglary in progress. Defendants concede that an officer may enter a dwelling without a warrant if he reasonably believes a burglary is being committed therein. (See *People* v. *Bradley* (1982) 132 Cal.App.3d 737, 744 [183 Cal.Rptr. 434].) They maintain, however, that the facts known to the officer at the time of his entry do not support a reasonable belief that the crime was still in progress. The issue is thus what the officer believed and whether his actions were reasonable in light of these beliefs.

There was conflict in the testimony both at the preliminary hearing and the motion to suppress regarding the police broadcast, i.e., whether it had stated that the burglary had occurred or was occurring and whether the neighbor had told Paulson the suspects had fled with the television or had run around the side of the house. But Paulson testified he found an open window with a television and other articles beneath it. He thought the suspects were still inside because "they put the contraband sitting on the outside. Usually if they're going to be gone, they'd take it with them so there is a possibility that they are still inside collecting more loot."

Apparently the trial judge believed Paulson. He found reasonable his suspicion that one or more of the burglars was still inside. The factual aspect of this ruling—that the officer did in fact believe the suspects were in the house—must be upheld if it is supported by substantial evidence. (*Leyba, supra,* 29 Cal.3d at pp. 596-598.) We hold that it is. Even if Paulson had been told the suspects had fled, the presence of a television and other property beneath the open window could mean the witness was wrong about the flight, or other burglars were still inside collecting more property, or the fleeing burglars had returned. These possibilities support the reasonableness of Paulson's actions. It would have been poor police work indeed for an

officer to fail to investigate under circumstances suggesting a crime in progress.

## B. *Sergeant House*

 That Paulson's entry was permissible does not necessarily justify the subsequent entry of Sergeant House. The initial justification for Paulson's entry—the possibility that burglars were inside the house—ended when he discovered the house was empty; a search or seizure based on exigent circumstances ends when the emergency passes. (*People* v. *Roberts, supra,* 47 Cal.2d 374, 378-379.) However, "in the course of conducting a reasonable search [the police do] not have to blind themselves to what [is] in plain sight simply because it [is] disconnected with the purpose for which they entered. [Citations.]" (*Id.*, at p. 379.) When Paulson stumbled on what he believed to be an illicit drug laboratory, he gained a new justification for being present in defendants' house.

Defendants do not dispute this proposition. Rather, they maintain that Paulson did not realize he had discovered contraband and thus House's entry was an unlawful "confirmatory search" akin to the search we condemned in *People* v. *Cook* (1978) 22 Cal.3d 67 [148 Cal.Rptr. 605, 583 P.2d 130]. In that case a landlord informed the police that his tenant was operating a drug laboratory. The police approached the premises and observed the laboratory from the door, which was open because the landlord was still inside. Based on these observations, the police searched the house and arrested the defendant. We criticized this police behavior, holding that when an informant gives an officer probable cause to believe a search is justified, the officer must apply for a warrant. Otherwise, a police officer "need not rely solely on lawfully obtained probable cause; he can instead achieve 'certain cause' by conducting an unlawful confirmatory search, thus saving himself the time and trouble of obtaining and executing a warrant if he does not find the evidence." (*Cook, supra,* 22 Cal.3d at p. 98.)

The situation in the case at bar is distinguishable from *Cook*. Whereas in that case an officer with probable cause for a warrant entered a dwelling to be "extra certain" before he went to the trouble of obtaining a warrant, here an officer was lawfully on the premises already. The second officer's entry went no further than that of the first officer, and was meant only to interpret what the first officer had already seen. The second officer's entry was thus a minimal additional intrusion on the defendant's privacy. (*People* v. *Cornejo* (1979) 92 Cal.App.3d 637, 650 [155 Cal.Rptr. 238].)

The facts of *People* v. *Plane* (1969) 274 Cal.App.2d 1 [78 Cal.Rptr. 528], are analogous. In that case a police officer lawfully present in the defendant's

dwelling viewed, in plain sight, certain plants he believed to be marijuana. Desiring to be certain the plants were contraband, the officer called in his sergeant. The Court of Appeal held that the second officer's arrival "did not amount to an entry by the police—Officer Kitchen was already there. The Sergeant's appraisal of the substance might very well have exonerated Plane from any suspicion, thus relieving him of further investigation or a possible future entry. We think the legitimate requirements of law enforcement allowed Officer Kitchen, rightfully in Plane's apartment, who reasonably suspected a felony was therein being committed, to call in a brother officer for the purpose of confirming or invalidating his identification." (*Id.*, at pp. 5-6.)

Defendants seek to distinguish *Plane* on the ground the parties there stipulated that the first officer had identified the plants as contraband; in the case at bar, defendants maintain, Paulson did not know whether the laboratory was unlawful. But this distinction lacks significance: Paulson testified repeatedly that he thought the laboratory was illegal, and apparently the judge believed him. It was far less an intrusion into defendants' privacy for an officer inexperienced in drug manufacturing to call in his supervisor to be certain that unlawful activity was afoot than it would have been if a full-scale search pursuant to a warrant had been launched, only to reveal the activity was innocent. Paulson's reasonable suspicion of ongoing illegal activity thus justified House's entry to confirm his belief.

### C. *Officer Gremminger*

Although House and Paulson were lawfully present in the dwelling, Gremminger's entry must be justified independently. The Attorney General, citing *Michigan* v. *Tyler* (1978) 436 U.S. 499 [56 L.Ed.2d 486, 98 S.Ct. 1942], seeks to support Gremminger's entry as a mere continuation of the searches by House and Paulson. But *Tyler* is distinguishable: in that case, police officers repeatedly entered and exited a fire-gutted building without a warrant in order to investigate for possible arson. The Supreme Court held that each entry was part of one continuing search and was justified by the need to investigate the fire. (*Id.*, at p. 511 [56 L.Ed.2d at pp. 499-500].) In the case at bar, however, intervening circumstances broke the continuity. Before Gremminger arrived on the scene, House and Paulson left the premises and defendant Duncan entered the house and apparently retrieved the articles underneath the back window; later, when House knocked on the door and questioned Duncan about the burglary, Duncan stepped outside and closed the door behind him, indicating he wished to keep the premises free from police intrusion. Thus Gremminger's entry was distinct from those of Paulson and House and as such requires independent justification. (*People* v. *Keener* (1983) 148 Cal.App.3d 73, 78 [195 Cal.Rptr. 733] [police officer

legitimately in defendant's residence could lawfully have seized gun in plain sight, but once he left the premises his subsequent entry to seize the gun was unlawful without a warrant].)

Amicus curiae Appellate Committee of the California District Attorneys' Association contends that Gremminger's warrantless entry was justified by the exigent circumstances created by the presence of a drug laboratory and the strong smell of ether, i.e., the volatile nature of the chemicals involved in the manufacture of drugs such as PCP and methamphetamine and the inexpert manner in which such chemicals are handled by residential producers of such drugs creates a serious danger of explosion. On the other hand, defendants rely on Court of Appeal decisions holding that such circumstances do not constitute an emergency situation that would permit the warrantless entry of a dwelling. We therefore examine the conflicting cases addressing this issue.

Defendants quote extensively from *People* v. *Dickson* (1983) 144 Cal.App.3d 1046 [192 Cal.Rptr. 897]. In that exhaustive opinion the Court of Appeal held that the smell of ether alone does not constitute an exigent circumstance. (*Id.,* at pp. 1065-1068.) In reaching this conclusion the court referred to three federal cases involving drug laboratories. In *United States* v. *Tate* (9th Cir. 1982) 694 F.2d 1217 (vacated on other grounds, *United States* v. *Tate* (1984) 468 U.S. 1206 [82 L.Ed.2d 873, 104 S.Ct. 3575]), a police officer, pursuant to a warrant, arrested the defendants and searched a house in which they had been observed. The court held the warrant to be invalid because the affidavit supporting it was insufficient to establish probable cause: it had stated only that a strong smell of ether was emanating from the subject house and that ether was used in the manufacture of PCP. "Ether has many innocuous uses. It is a very common solvent, and is also used to start engines. While the strong smell of ether may be a factor in establishing probable cause, the government cites no case, and we have found none, holding that the smell of ether, *without more,* establishes probable cause to search." (*Id.,* at p. 1221, italics in original.)

Not only does ether have innocuous uses, the court in *Dickson* reasoned, but federal drug agents, who presumably know the nature of their business, have been known to bide their time when confronted with ether in the manufacture of illicit drugs. In *People* v. *Clayborne* (10th Cir. 1978) 584 F.2d 346, federal drug agents placed an electronic tracking device in a drum of ether purchased by one of the defendants. They followed the drum to commercial premises leased by the other defendant, and surveyed the area for one full day before obtaining and executing a search warrant. In *United States* v. *Baldwin* (5th Cir. 1982) 691 F.2d 718, a narcotics agent surveyed for approximately three days an apparent drug laboratory that emanated a

strong ether odor before obtaining a warrant. These cases, reasoned the court in *Dickson,* teach us that the presence of ether can be perfectly legal, and even when used in the illicit manufacture of drugs does not necessarily create an imminent threat to life or property. (144 Cal.App.3d at pp. 1065-1068; accord, *People* v. *Blackwell* (1983) 147 Cal.App.3d 646 [195 Cal.Rptr. 298].)

Other courts have reached results apparently inconsistent with *Dickson.* In *People* v. *Patterson* (1979) 94 Cal.App.3d 456 [156 Cal.Rptr. 518], an informant told a police officer that PCP was being sold at a certain residence, and telephoned the residence, with the officer listening on an extension, to place an order. The voice on the telephone responded that the drug would be "made up" immediately, leading the officer to believe the manufacture of the drug was in progress, and that a danger too immediate to wait for a warrant existed. The officer entered the house without a warrant, smelled ether and followed the odor to an illicit laboratory. The court upheld the search: "Given the information [the officer] had previously received and his awareness of the volatile nature of the chemicals used to make PCP, it was certainly reasonable at that point for [the officer] to seek out the source of the odor in order to determine whether the officers and the other occupants of the house (including a child) were in danger." (*Id.,* at p. 465.)

In *People* v. *Stegman* (1985) 164 Cal.App.3d 936 [210 Cal.Rptr. 855], a strong ether smell led police to the defendants' house. Climbing over a fence, a police officer approached the house and saw vats of chemicals and a vacuum pump in operation, all the while smelling the powerful odor of ether. Seeing people inside, the officer announced his presence, entered the house and chased the defendants as they ran away. The court held that the entry into the residence was justified by the exigent circumstances of the fleeing defendants and the need to avert an explosion of the chemicals. (*Id.,* at p. 943.) The case was distinguished from *Blackwell* in which the danger of explosion had been neutralized at the time of the challenged police entry, whereas in *Stegman* the danger remained. (*Id.,* at p. 945.)

In *People* v. *Messina* (1985) 165 Cal.App.3d 937 [212 Cal.Rptr. 75], the Court of Appeal performed an in-depth analysis of the extreme toxicity and flammability of the chemicals used in the manufacture of methamphetamine. Quoting extensively from the Drug Enforcement Administration's Clandestine Laboratory Guide, the National Fire Protection Association's Fire Protection Guide on Hazardous Materials (6th ed. 1975), and various chemical dictionaries, the court held that "Beyond a shadow of doubt, the presence of these chemicals in an unprofessional laboratory in a residential area constitutes an emergency which requires immediate and proper response by law enforcement." (*Id.,* at p. 944.) The police officer's warrantless arrest

of the defendant and search of his residence, based on the smell of ether and a tip that methamphetamine was being manufactured there, was thus reasonable. (*Id.*, at p. 945; see also *People* v. *Baird* (1985) 168 Cal.App.3d 237 [214 Cal.Rptr. 88], following *Stegman* rather than *Dickson,* but concluding on the facts of the case that the police believed no emergency existed.)

■ The varied factual circumstances of these cases teach a clear lesson: there is no absolute rule that can accommodate every warrantless entry into premises housing a drug laboratory. It is manifest that the emergency nature of each situation must be evaluated on its own facts. We can provide guidelines by which the facts can be judged, but we decline to rule as a matter of law that these warrantless searches are, or are not, justified.

We first address the situation in which a police officer smells the odor of ether, but has no other reliable evidence that a drug laboratory is in operation. It is true that ether has legitimate uses and thus its smell alone does not provide probable cause for a search or exigent circumstances excusing a warrant. (*Dickson, supra,* 144 Cal.App.3d at pp. 1054-1055; *Tate, supra,* 694 F.2d at p. 1221.) But we do not adopt the implication in *Dickson* that a police officer who smells a strong ether odor must end his investigation at that point. In *Stegman* the court emphasized that in certain circumstances the odor of ether can be indicative of danger. For example, in that case a neighbor smelled the ether from two houses away. A concentration of the chemical strong enough to be noxious from such a distance is not only highly explosive, but is also toxic to those at the source, whether it is being used for licit or illicit purposes. (164 Cal.App.3d at p. 946.)

Further, the pervasive odor of ether in a residential neighborhood, while unusual, may be consistent with either lawful or unlawful activity. The situation can be analogized to that in *In re Tony C.* (1978) 21 Cal.3d 888 [148 Cal.Rptr. 366, 582 P.2d 957]. We there held that an officer may briefly detain a suspect if he believes criminal activity is afoot. "[I]f the circumstances are 'consistent with criminal activity,' they permit—even demand—an investigation: the public rightfully expects a police officer to inquire into such circumstances 'in the proper discharge of the officer's duties.' [Citation.] No reason appears for a contrary result simply because the circumstances are also 'consistent with lawful activity,' as may often be the case. The possibility of an innocent explanation does not deprive the officer of the capacity to entertain a reasonable suspicion of criminal conduct. Indeed, the principal function of his investigation is to resolve that very ambiguity and establish whether the activity is in fact legal or illegal . . . ." (*Id.*, at p. 894.) Similarly, the strong smell of ether, equally consistent with criminal

and innocent activity, but in either event indicative of possible danger, justifies further investigation by law enforcement officers.[3]

If this further investigation reveals "an emergency situation requiring swift action to prevent imminent danger to life or serious damage to property, or to forestall the imminent escape of a suspect or destruction of evidence" (*People* v. *Ramey, supra,* 16 Cal.3d 263, 276), a warrantless entry, search or arrest may be justified. "[I]n each case the claim of an extraordinary situation must be measured by the facts known to the officers." (*Ibid.*)

In *Dickson,* the court divided the question whether exigent circumstances exist into two separate inquiries: whether the officer's primary motivation was to save lives and property, and whether a reasonable police officer would have found the threat so imminent and serious that a warrantless entry was necessary. (144 Cal.App.3d at p. 1063.) On the other hand, the court in *People* v. *Baird, supra,* 168 Cal.App.3d 237, 244, declared: "while we agree that both subjective and objective criteria must be examined in any motion to suppress, we disagree with the *Dickson* court's formulation and application of the subjective test. In particular, we object to the court's requirement that the officer's *primary* motivation must be determined, and question its apparent holding that it is the appellate court which must determine what the officer believed." (Italics in original.) We agree with *Baird.*

It is unreasonable to expect an officer to be unconcerned with the collection of evidence and the capture of criminals. While the trial court must find that the officer believed an emergency to exist, reasonable actions taken by the officer should not preclude such a finding. For example, in *Stegman* the officer waited for a backup unit before entering the defendants' property. As the court stated, "[p]ersons in the process of manufacturing illicit drugs may reasonably be expected to be armed and willing to use arms to prevent apprehension. An officer is not required to rush blindly into a potential illicit drug laboratory and possibly encounter armed individuals guarding the enterprise, with no regard for his own safety just to show his good faith belief the situation is emergent." (164 Cal.App.3d at pp. 945-946.)

On the other hand, if the officers act in a manner inconsistent with a motive to preserve life or property, the warrantless entry or search cannot be justified after the fact by employing the exigent circumstances doctrine. (*People* v. *Superior Court (Simon)* (1972) 7 Cal.3d 186, 198 [101 Cal.Rptr.

---

[3]We cite *Tony C.* only as an analogy to illustrate a general principle. We recognize that the quoted discussion deals with the minimal level of suspicion necessary to support a brief detention in a public place. More is required, of course, to justify entering a private house for investigative purposes.

837, 496 P.2d 1205].) For example, in *People* v. *Baird, supra,* 168 Cal.App.3d 237, a police officer smelled ether as he was driving down a road. A large contingent of officers subsequently arrived at the scene; without a warrant one entered and conducted a search. Five hours had passed between the time the first officer smelled the ether and the other officer entered the dwelling; although the officers knew there were people inside, no effort had been made to warn or remove them; and among the group of officers at the scene was one who was instructed to prevent any suspects from leaving the house. Under these circumstances it is evident the officers did not perceive any immediate danger in the situation. The court held there was no evidence that any of the officers believed an emergency existed.

When the foregoing principles are applied to the facts of the case at bar, it is clear that Gremminger believed an emergency existed. He was informed by House that an illicit drug laboratory was operating on the premises. Neither House nor Paulson was able to tell him whether anything was actually being heated in the apparatus, and defendant Duncan, understandably, would not say a word without his lawyer's advice. By the time Gremminger arrived, the smell of ether emanating from the residence was strong enough to be noticeable from the driveway. He testified at the hearing on the motion to suppress that he entered the house "To ascertain if the lab possibly was going to blow up, if something in there was cooking or needed immediate attention or if we had to vacate the neighborhood." His actions confirm this motive: he paused outside only long enough to question House, Paulson, and Duncan about what was inside the house, he called the fire department as he entered, he remained inside only long enough to take pictures and to discover whether the laboratory was in operation and when the fire department arrived he ordered the firemen to ventilate the house and shut off the gas and electricity. Thus substantial evidence supports the trial court's finding that Gremminger believed exigent circumstances existed.

We further hold that Gremminger's belief and response thereto were reasonable under the circumstances. The extremely volatile nature of chemicals, including ether, involved in the production of drugs such as PCP and methamphetamine creates a dangerous environment, especially when handled unprofessionally by residential manufacturers of illicit drugs. Although an inactive laboratory with secure, well-stored chemicals may present no immediate danger, the converse applies to an ongoing operation such as found here. On these facts it was reasonable for Gremminger to believe that dangerous chemicals were being mishandled on the premises, and to act to protect life and property from that danger. His warrantless entry into defendants' residence was therefore justified by a reasonable belief that exigent circumstances requiring immediate action existed.

The judgments are affirmed.

Broussard, J., Reynoso, J., Grodin, J., Lucas, J., and Cecchettini (Horace), J.,* concurred.

**BIRD, C. J.**—I concur in the majority opinion with the understanding that it does not undermine the established principle that exigent circumstances normally circumscribe the scope of a warrantless search.

The majority imply that dealing with an exigency need not be the "primary" motive of officers who enter a home without a warrant, since "[i]t is unreasonable to expect an officer to be unconcerned with the collection of evidence and the capture of criminals." (Maj. opn., *ante,* at pp. 104.) This language should not be read to mean that the *scope* of the search may be dictated by these latter motives.

The law is clear. The scope of a search based on exigent circumstances, excusing the need to comply with the warrant requirement, must be narrowly circumscribed to minimize the intrusion upon the privacy of a home. (See *People* v. *Block* (1971) 6 Cal.3d 239, 244 [103 Cal.Rptr. 281, 499 P.2d 961]; *People* v. *Roberts* (1956) 47 Cal.2d 374, 378-379 [303 P.2d 721]; *People* v. *Dickson* (1983) 144 Cal.App.3d 1046, 1063-1064 [192 Cal.Rptr. 897], and cases cited.) As I read the majority opinion, it holds nothing more than that Officer Gremminger did not exceed the scope of a permissible exigent-circumstances search when he took photographs in the course of determining the volatility of the potentially explosive laboratory. Had he extended his search to other rooms for purposes of "collect[ing] . . . evidence and . . . captur[ing] . . . criminals" (maj. opn., *ante,* at p. 104), and assuming such an extension was not required by the exigency, this court would invalidate the search since the basis for the warrantless intrusion would have ceased to exist.

The majority's admonition that an officer must not "act in a manner inconsistent with a motive to preserve life or property" (maj. opn., *ante,* at p. 104) merely restates the principle that an invasion of privacy may not extend any farther than what is required by the emergency at hand. Any act which extends a search beyond that which is necessary to deal with the immediate emergency is "inconsistent" with that purpose and prohibited.

---

*Judge, Sacramento County Superior Court, assigned by the Chairperson of the Judicial Council.

With these concerns allayed, I concur in today's judgment.

Reynoso, J., concurred.

Appellants' petition for a rehearing was denied August 28, 1986.