[No. A079356. First Dist., Div. Four. Mar. 25, 1999.]

STEVEN BRODEN, Plaintiff and Appellant, v.
MARIN HUMANE SOCIETY, Defendant and Appellant.

1214

## Counsel

J. David Nick for Plaintiff and Appellant.

Krause & Baskin, Lawrence A. Baskin; and Reed E. Harvey for Defendant and Appellant.

## Opinion

**POCHÉ, J.**—Penal Code section 597.1[1] is a self-contained regulatory scheme covering treatment of animals. It provides that the failure to provide animals with "proper care and attention" is a misdemeanor. (Subd. (a).) It covers the authority of animal control officers over sick, injured, straying, or abandoned animals in nonemergency situations. It further provides that animals may be seized or impounded when such an officer "has reasonable grounds to believe that very prompt action is required to protect the health or safety" of the animals. (Subds. (a) & (b).) It deals with the circumstances in which an animal may be "killed" or "humanely destroyed." (Subds. (b), (c), (e) & (i).) Animals that were "properly seized" are to receive "care and treatment," the costs of which "shall constitute a lien on the animal" that the owner must pay before the animal is returned. (Subds. (a) & (b).) The owner of a seized or impounded animal is entitled to "a postseizure hearing to determine the validity of the seizure or impoundment," return of the animals, and liability for costs. (Subds. (f) & (j).)

---

[1]Subdivision references are to section 597.1. The version of the statute applicable to all relevant events herein is set out in its entirety in the attached appendix.

This statute, which has never been judicially construed, is at the heart of these appeals by both the owner of impounded animals, and the animal control agency that impounded them. The appeals present interesting issues of procedure, substance, and damages.

## BACKGROUND

Plaintiff Steven Broden ran a shop selling exotic reptiles. On the morning of the last day of 1995, Officer Kirsten Kane of defendant Marin Humane Society[2] went to the shop following a report of stench and flies at the store. Based upon her experience as an animal control officer, Kane knew the smell was deceased animal flesh. Kane called three telephone numbers trying to locate plaintiff, all to no avail. Kane's supervisor approved entry into the shop once Kane had arranged for police backup. The stench inside the shop was so overpoweringly bad that the fire department had to bring breathing apparatus. A veterinarian called to the scene described the odor of decaying flesh as "horrific," apparently coming from two large snakes that had been dead for at least 36 hours. All animals were taken to the Marin Humane Society. As required by section 597.1, Kane posted a notice to the shop door advising plaintiff that the animals had been seized and that he could "request a post-seizure hearing."

Plaintiff did so request, and the postseizure hearing was conducted before a hearing officer on January 8, 1996. The hearing officer made three conclusions: (1) the entry into plaintiff's shop was reasonable and proper, (2) plaintiff was not entitled to have the animals returned to him because he had not demonstrated "either a willingness or ability to properly care for these animals," and (3) plaintiff would be liable for "all costs of care and treatment" required by the animals.

Plaintiff thereafter filed a petition for a writ of administrative mandamus.[3] The trial court concluded that the search was valid but that the matter had to return to the hearing officer. The court concluded that the hearing officer "failed to apply the proper statutory standard" for determining when impounded animals can be returned to their owner. The hearing officer had required plaintiff to prove he could provide proper care, but section 597.1

---

[2]The society is a private entity that contracts with the County of Marin and other governmental subdivisions to provide animal control services. The society was erroneously sued as Marin Animal Services, its contracting name and the designation used through most of the record.

[3]Plaintiff titled his pleading "Petition for Writ of Mandate/Prohibition" but subsequently took the position that the relief he was seeking was administrative mandamus.

uses the alternative standard of the animal being "physically fit."[4] "The Hearing Officer improperly required [Plaintiff] to show that he could provide the necessary care for the animals without regard to whether or not they were physically fit at the time of hearing. Therefore, this matter is remanded to the Hearing Officer for a further hearing on the question of whether the animals in question were physically fit on January 8, 1996 (the date of hearing) or, if not, when, if ever, they became physically fit, and therefore, when they could be returned to the owner." The hearing officer was directed to make a written report, following which "this Court shall consider the question of damages . . . ."

The hearing officer conducted a "rehearing" and received additional evidence. The report forwarded to the trial court stated that when impounded "all of the reptiles were infested with mites" and required treatment that "would take approximately two to three weeks to be effective." The only animals that could have been returned on January 8, 1996, were 91 "rodents." Twelve animals could have been returned "on or about January 14, 1996," twenty-one "were fit to be returned on February 8, 1996," and eight "were never fit to be returned because of health problems or their deaths." The hearing officer also identified 17 snakes and lizards that had been "adopted out" and 13 snakes had been "euthanized" for a variety of reasons.

When proceedings resumed in the trial court, the hearing officer's "report" was filed and a reporter's transcript of the "rehearing" conducted by the hearing officer was received in evidence.[5] The issues of damages suffered by plaintiff, and costs incurred by defendant, were tried by declaration. After missing the filing deadline and being granted relief pursuant to Code of Civil Procedure section 473, plaintiff submitted a declaration by Owen Maercks, the owner of "the nation[']s oldest and biggest reptile and amphibian sales facility." He computed that the snakes which had been "euthanized" or "adopted out" had a value of $27,310; $16,580 was attributed to "offspring." He also provided figures for reasonable boarding costs. Defendant responded with a declaration from Cindy Machado, its animal services director. Machado submitted wholesale values she had been quoted over the

---

[4]Section 597.1 twice states that impounded animals are not to be returned until "the seizing agency or hearing officer has determined that the animal is physically fit *or* the owner demonstrates to the seizing agency's or the hearing officer's satisfaction that the owner can and will provide the necessary care." (Subd. (f)(4), italics added; accord, subd. (j); see also subd. (i) [seized animal requiring veterinary care not to be returned until owner satisfies the seizing agency that "the owner will provide the necessary care"].)

[5]This transcript is not included in the record on these appeals. The record has no transcripts for any of the proceedings in the trial court.

internet and by two "reptile wholesalers."[6] The prices compiled by Machado were approximately 90 percent lower than Maercks and did not include anything for "offspring." Machado's declaration also showed that defendant had incurred "impound fees" of $420, "board fees" of $9,504, and a "veterinary bill" of $912.50.

The trial court accepted the Maercks opinion quoted by Machado as "the valuation of the seized animals" and Maercks's own boarding costs. The "damages due to . . . the value of the seized animals" would be offset by boarding fees due defendant. The court denied defendant's requests for impound fees and the veterinary bill on the ground that "these fees are not the responsibility of [plaintiff]."

More than six weeks later plaintiff again sought relief pursuant to Code of Civil Procedure section 473. He asked for leave to submit a new declaration by Maercks and to revisit the court's prior ruling that the claimed offspring damages were too speculative. He also requested "the court order a hearing be held where Machado and Maerck [sic] are called to testify and for the court to at that time consider the damages owed to [plaintiff]." The court granted the motion in part; it considered the new Maercks declaration but declined to order an evidentiary hearing. The court concluded that "damages owed . . . for destroyed animals will remain as previously set" at $2,574. In response to a different motion by plaintiff, the court also concluded that all but two of the seized animals "were physically fit and in suitable condition to be returned to the owner . . . as of January 8, 1996."

In due course the court entered a judgment awarding plaintiff a net of $1,004 (damages of $2,540 offset by boarding costs of $1,536). Each party thereafter filed a timely notice of appeal.

REVIEW

I

Section 597.1 specifies that the owner of animals that have been seized or impounded has the right to request that a postseizure hearing be conducted within 48 hours. It also provides that "The seizing agency may authorize its own officer or employee to conduct the hearing if the hearing officer is not the same person who directed the seizure or impoundment of the animal and is not junior in rank to that person. The agency may utilize the services of a hearing officer from outside the agency for the purposes of complying with

---

[6]One of whom was Mr. Maercks, plaintiff's damage expert. Machado listed prices Maercks had quoted to her two months before he executed the declaration for plaintiff.

this section." (Subd. (f)(2).) ■ One of the grounds on which plaintiff sought mandamus was that this provision was unconstitutional because it violated the due process right to "an impartial non biased fact finder." The trial court denied this claim, finding also that there was no "showing of actual bias" by the hearing officer. Plaintiff renews his claim.

The hearing officer here was not an employee of defendant, but an attorney from outside Marin County. The transcript of the hearing he conducted is a part of the record on appeal. It substantiates the trial court's conclusion that actual bias is not discernible. Moreover, plaintiff never raised his claim during the administrative process, which means that the issue can be treated as waived. (See, e.g., *Linney* v. *Turpen* (1996) 42 Cal.App.4th 763, 770, 777-778 [49 Cal.Rptr.2d 813].) Plaintiff's claim fails for both of these reasons.[7]

## II

■ The hearing officer concluded that the officers' entry into plaintiff's store was supported by reasonable belief in the need for prompt action. The trial court agreed: "The record strongly supports the hearing officer's finding that exigent circumstances justified both the search and seizure by the Officers . . . . These officers had reasonable grounds to believe that very prompt action was required to protect the health and safety of the animals seized." Plaintiff attacks these findings, contending that there were no exigent circumstances as a matter of law.

■ We agree with the parties that the statutory language authorizing immediate seizure when an animal control officer "has reasonable grounds to believe that very prompt action is required to protect the health or safety

[7]We do not see *Haas* v. *County of San Bernardino* (1999) 69 Cal.App.4th 1019 [81 Cal.Rptr.2d 900] review granted April 28, 1999 (S076868) as compelling a contrary result. The *Haas* court concluded due process required overturning an administrative license revocation conducted pursuant to county ordinance. The court stated its holding in these terms: "[W]e limit our decision to the totality of the particular circumstances in this case, in which the hearing officer was unilaterally, selected, retained and paid by the party threatening deprivation of an adversary's constitutionally protected property rights; the attorney who retained the hearing officer participated in the hearing; and there was a complete absence of any restrictions on the selection of the hearing officer to ensure a reasonable degree of impartiality. Under such circumstances, we conclude Haas was deprived of his constitutional due process right to a fair hearing conducted by an impartial hearing officer." (*Id.* at p. 1032.)

There are at least two factors that distinguish plaintiff's situation from that of Haas. First, unlike plaintiff, Haas made a contemporaneous objection to the hearing officer's partiality at the start of the administrative hearing. (*Haas* v. *County of San Bernardino, supra*, 69 Cal.App.4th 1019, 1024, review granted April 28, 1999 (S076868).) Second, and again unlike plaintiff, Haas brought up an adequate record on appeal establishing the details of the nature of the relationship between the hearing officer and the county.

of others" is the equivalent of the exigent circumstances exception familiar to search and seizure law. That exception allows entry without benefit of a warrant when a law enforcement officer confronts an emergency situation requiring swift action to save life, property, or evidence. (E.g., *People* v. *Duncan* (1986) 42 Cal.3d 91, 97-98 [227 Cal.Rptr. 654, 720 P.2d 2]; *Cleaver* v. *Superior Court* (1979) 24 Cal.3d 297, 302 [155 Cal.Rptr. 559, 594 P.2d 984].) There is no litmus test for emergencies; every case must be explained in light of what was known to the officer at the time of entry. (E.g., *People* v. *Wharton* (1991) 53 Cal.3d 522, 577 [280 Cal.Rptr. 631, 809 P.2d 290]; *Conway* v. *Pasadena Humane Society* (1996) 45 Cal.App.4th 163, 172 [52 Cal.Rptr.2d 777].)

▮ The following excerpts from the report of Officer Kirsten Kane, which was received in evidence at the postseizure hearing, makes out a compelling case of exigent circumstances: "On December 31, 1995, at approximately 11:49 a.m., I was dispatched . . . to check care and conditions of reptiles at 939 Tamalpais, San Rafael. . . [An employee at the Marine Animal Shelter] told me the reporting person was at the store on December 30th and noticed a strong stench emitting from the store. She also noticed many flies around the store.

"I arrived at the scene . . . at approximately 12:25 p.m. When I exited my vehicle and went to the front of the store, I could definitely smell a strong stench. From my prior experience of dealing with deceased animals in the field, the first thing that came to my mind was something was dead. The blinds were down and the door was locked. Not only were there flies on the inside of the building, they were on the outside trying to get in. I then decided to return to the shelter to get more information on the owner.

"When I arrived back at the shelter I called Captain Cindy Machado. I explained what was happening. She told me to try to get Steve Broden, the owner of the store, on the phone. I was to ask him to meet me at the scene. If he was unavailable, or would not cooperate, I was to contact San Rafael Police Department for back-up. I then tried the three numbers listed for the owner. No one answered and there was no answering machine. I then had communications notify San Rafael Police Department that we would need assistance.

". . . [S]oon after San Rafael Police Department arrived[, a] tenant from above the store asked if she should notify the landlord of the store. We told her to go ahead. She then advised us that the landlord did not have a key. San Rafael police then popped the glass out of the door—this allowed me to open the door from the inside."

There is no question that law enforcement officers may make a warrantless entry of a building when there are reasonable grounds for believing that persons inside are in need of immediate aid. (E.g., *Tamborino* v. *Superior Court* (1986) 41 Cal.3d 919, 924 [226 Cal.Rptr. 868, 719 P.2d 242].) Section 597.1 clearly contemplates that animals shall receive a similar solicitude. Here, Officer Kane received information from a presumptively reliable citizen complainant (see *People* v. *Ramey* (1976) 16 Cal.3d 263, 269 [127 Cal.Rptr. 629, 545 P.2d 1333]), information she verified when she went to the scene. Kane's visit, together with her past experience, gave a whole new dimension to the report of a bad smell; Kane treated the smell as that of dead animals. The fact that flies were trying to get *into* the building was powerful corroboration for believing dead animals were inside. Kane could not see inside the building. The landlord would be no help because he did not have a key. Repeated attempts to reach Broden were unavailing and, with no answering machine, held no prospect of success. Short of visible slaughter or blood oozing under the door, a more compelling case for immediate entry cannot be imagined. Substantial evidence supports the findings of the hearing officer and the trial court that Kane's warrantless entry was justified by exigent circumstances.

### III

■ Plaintiff contends that the trial court "violated [his] due process rights when it refused his demand for an evidentiary hearing [where] it could resolve the conflict" between the declarations submitted by Machado and Maercks. It is important to remember the context in which plaintiff made his motion. His request for an evidentiary hearing came as part of his second motion for relief pursuant to Code of Civil Procedure section 473 and more than six weeks after the court had already decided the issue of damages. Plaintiff's evidentiary hearing "demand" thus appears the functional equivalent of a motion to reopen for further evidence, a motion entrusted to a trial court's considerable discretion. (E.g., *Guardianship of Phillip B.* (1983) 139 Cal.App.3d 407, 428 [188 Cal.Rptr. 781].) The trial court granted plaintiff's motion for relief, thus allowing the court to consider the second declaration submitted by Maercks. Having reviewed that declaration, the court declined to alter the damage figure it had previously fixed. A trial court does not abuse its discretion when its refuses to reopen a case for new evidence that will not produce a different result. (E.g., *Fry* v. *Sheedy* (1956) 143 Cal.App.2d 615, 622 [300 P.2d 242]; *Gluskin* v. *Lehrfeld* (1955) 134 Cal.App.2d 804, 810 [286 P.2d 457].) A motion to reopen is also subject to a diligence requirement. (E.g., *Guardianship of Phillip B., supra*, at p. 428.) Defendant opposed the motion with a persuasive argument that this requirement was not satisfied. Because the trial court gave no specific reason(s) for denying plaintiff's motion, we can, and do, presume that denial was for

either or both of these grounds. (See, e.g., *Denham* v. *Superior Court* (1970) 2 Cal.3d 557, 564 [86 Cal.Rptr. 65, 468 P.2d 193].) Finally, it is impossible to find abuse in the court that had already, on this very issue, twice granted plaintiff relief from default pursuant to Code of Civil Procedure section 473.

## IV

Plaintiff's final contention is that he was improperly denied recovery of his "offspring" damages. Defendant responds that plaintiff's claim is moot because he has no right to any damages as a matter of law.

Defendant's position is based upon a reading of subdivision (h), which provides: "If any animal is properly seized under this section, the owner or keeper shall be personally liable to the seizing agency for the cost of the seizure and care of the animal. Furthermore, if the charges for the seizure or impoundment and any other charges permitted under this section are not paid within 14 days of the seizure, or, if the owner, within 14 days of notice of availability of the animal to be returned, fails to pay charges permitted under this section and take possession of the animal, the animal shall be deemed to have been abandoned and may be disposed of by the impounding officer."

Shortly after the hearing officer had conducted the postseizure hearing, and in accordance with various provisions of section 597.1,[8] defendant sent plaintiff a "Notice of Lien." Dated January 10, 1996, it stated in pertinent part: "Please be advised that the cost for the seizure and care of your animals for the first 14 days is due to be paid by January 14, 1996. If these charges are not paid by that date the animals will be forfeited pursuant to Penal Code [section] 597.1 and will become the property of the Marin Humane Society. . . . If the charges are not paid you are still responsible for all costs of impounding and caring for the animals up until the time they do become society property."[9] Attached to the notice was a tabulation of the "charges"—$420 for "impound fees," $9,504 for "board fees," and $912.50 for "veterinary bill," making a "Grand Total Due" of $10,836.50. The lien served as the basis of one of the affirmative defenses raised in defendant's answer, but the trial court did not view it as a barrier to plaintiff's recovery of damages.

Defendant relies on the plain language of subdivision (h). Plaintiff perceives subdivision (h) as calling for forfeiture of seized animals, thus

---

[8] See footnote 10, *post.*

[9] This was the second notice plaintiff had received advising him that he would be held financially responsible. The seizure notice Officer Kane posted on plaintiff's shop door informed him that "Costs for care/treatment of animal(s) properly seized are liens against the animal(s). No animal will be returned until liens are paid."

invoking the rule that forfeiture provisions are to receive a narrow construction. (E.g., Civ. Code, § 1442; *People* v. *United Bonding Ins. Co.* (1971) 5 Cal.3d 898, 906 [98 Cal.Rptr. 57, 489 P.2d 1385].) He suggests that the subdivision be read as embracing two scenarios. "The first scenario occurs if (1) a hearing officer decides the seizure was justified; and (2) the animals are 'physically fit' and ready to return, then the impound fee requirement arises. The second scenario is where the seizure is determined lawful, but the animals are not yet physically fit. In that case, the impound fee obligation will arise once the seized animals become physically fit. In both situations, however, the law assumes that the seizing agency will physically *return the property* to its owner upon payment of the impound fees." (Original italics.) We agree with defendant.

A recurring theme of section 597.1 is that animal owners will pay, literally, when animal control officers have cause to take an animal into custody.[10] The language of subdivision (h) is as plain as plain can be. The owner "*shall* be personally liable . . . for the cost of the seizure and care of the animal." (Italics added.) Any "charges for the seizure or impoundment"

---

[10]Each of the two provisions authorizing seizures states: "The cost of caring for and treating any animal properly seized under this subdivision shall constitute a lien on the animal and the animal shall not be returned to its owner until the charges are paid, if the seizure is upheld pursuant to this section." (Subds. (a) & (b).) The provision devoted to injured cats and dogs has almost identical language: "The cost of caring for and treating any animal seized under this subdivision shall constitute a lien on the animal and the animal shall not be returned to the owner until the charges are paid." (Subd. (c).)

When animals have already been seized or are about to be seized, the owner is to receive a notice advising of the right to an administrative hearing. That notice must include "A statement that the cost of caring for and treating any animal properly seized under this section is a lien on the animal and that the animal shall not be returned to the owner until the charges are paid, and that failure to request or to attend a scheduled hearing shall result in liability for this cost." (Subd. (f)(1)(E); accord, subd. (g)(1)(E).) "Failure of the owner . . . to request or to attend a scheduled hearing shall result in a forfeiture of any right to a . . . hearing or right to challenge his or her liability for costs incurred." (Subds. (f)(3) & (g)(3).)

"The agency, department, or society employing the person who directed the seizure shall be responsible for the costs incurred for caring and treating the animal, if it is determined in the postseizure hearing that the seizing officer did not have reasonable grounds to believe very prompt action, including seizure of the animal, was required to protect the health or safety of the animal or the health or safety of others. If it is determined the seizure was justified, the owner or keeper shall be personally liable to the seizing agency for the cost of the seizure and care of the animal, the charges for the seizure and care of the animal shall be a lien on the animal, and the animal shall not be returned to its owner until the charges are paid and the seizing agency or hearing officer has determined that the animal is physically fit or the owner demonstrates to the seizing agency's or the hearing officer's satisfaction that the owner can and will provide the necessary care." (Subd. (f)(4).)

And if a person is convicted of failing to provide proper care and attention to an animal, the animal is forfeited "for proper disposition" and the owner "shall be personally liable to the seizing agency for all costs of impoundment from the time of seizure to the time of proper disposition." (Subd. (k).)

will be paid "within 14 days of the seizure"[11] or the animal "*shall* be deemed to have been abandoned and may be disposed of by the impounding officer." (Italics added.) There is nothing in subdivision (h) about payment being deferred until the owner is restored to possession of animals.

Plaintiff insists that his construction has the support of the last sentence of subdivision (a)—"The cost of caring for and treating any animal properly seized under this subdivision shall constitute a lien on the animal and the animal shall not be returned to its owner until the charges are paid, if the seizure is upheld pursuant to this section." This sentence clearly looks to a different sort of situation, one where the animals are still being held by the seizing agency. By contrast, subdivision (h) addresses the situation where the seizing agency is not going to keep possession of seized animals.

Nor do we agree that it would, as plaintiff argues, be an "absurdity" or a "futile gesture" to require an owner "to pay lien fees without actually recovering his property." It is not absurd to require a litigant to pay money he disputes is owed; to cite one familiar example, that requirement is the norm in tax cases. (See Rev. & Tax. Code, §§ 5096, 5140, 6901, 19382.) Requiring payment before animals are returned can hardly be condemned as a futile gesture. As defendant points out, payment would be an unmistakable demonstration of the owner's earnestness in recovering possession of his or her animals. An owner who pays the seizing agency's lien is sending the unambiguous signal "I want my animals back," which would undoubtedly cause a seizing agency to pause before "adopting out" animals to new owners. The owner's payment could also literally keep seized animals alive in situations where the seizing agency might be inclined to discontinue medical treatment.[12]

The language of subdivision (h) and other provisions of section 597.1 are clear and without ambiguity. Its plain language is therefore to be applied.

---

[11]Or a "notice of availability of the animal to be returned." In this case there is nothing in the record showing that this type of notice was ever sent to plaintiff.

[12]"If the animal requires veterinary care and the [seizing agency] is not assured, within 14 days of the seizure of the animal, that the owner will provide the necessary care, the animal shall not be returned to its owner and shall be deemed to have been abandoned and may be disposed of by the impounding officer. . . . A veterinarian also may . . . humanely destroy an impounded animal afflicted with a serious contagious disease unless the owner or his or her agent immediately authorizes treatment of the animal . . . at the expense of the owner or agent." (Subd. (i).)

Defendant does not cite or rely upon subdivision (i), but it does appear to lend strong support to defendant's position. The postseizure hearing conducted January 8, 1996, acquainted plaintiff with the fact that the seized animals would require veterinarian treatment. Yet he did not, as the hearing officer expressly found, "demonstrate[] either a willingness or ability to properly care for these animals." According to the plain language of subdivision (i), this meant that defendant effectively forfeited all rights to his animals. The statutory language

(E.g., *People* v. *Hendrix* (1997) 16 Cal.4th 508, 512 [66 Cal.Rptr.2d 431, 941 P.2d 64]; *Great Lakes Properties, Inc.* v. *City of El Segundo* (1977) 19 Cal.3d 152, 155 [137 Cal.Rptr. 154, 561 P.2d 244].) Even the dislike of forfeiture provisions is overcome by language this clear. (See *Mundy* v. *Superior Court* (1995) 31 Cal.App.4th 1396, 1404-1405 [37 Cal.Rptr.2d 568] and decisions cited.) Because plaintiff had failed to pay the lien charges, and to give assurances that he would provide the seized animals with necessary care, the animals were required by subdivisions (h) and (i) to be deemed abandoned and their disposition left to defendant's discretion. Plaintiff no longer had any possessory or ownership interest in the animals that could support an award of damages. This moots his claim that he was erroneously denied recovery for the lost offspring of his animals. The only remaining issue is the amount of money that plaintiff will owe defendant. That is the subject of defendant's appeal, to which we now turn.

## V

Defendant's request that it recover $912.50 veterinary costs and $420 impound fees was denied by the trial court on the ground that "these fees are not the responsibility of [plaintiff]." Defendant contends that its entitlement to these fees is established as a matter of law. We agree.

We do not understand how the costs incurred by defendant in rescuing plaintiff's animals and restoring them to health could be the responsibility of anyone other than plaintiff. Plaintiff's leaving the animals unattended was the undoubted proximate cause of their subsequent distress that necessitated intervention by defendant. As shown in part IV, *ante*, section 597.1 takes great care with the issue of financial responsibility. The entry and seizure having been administratively and judicially upheld, plaintiff is "personally liable to the seizing agency for the cost of the seizure and care of the animal" (subds. (f)(4) & (h)). Similarly, defendant's lien notice gave plaintiff 14 days to reimburse defendant for "the charges for the . . . impoundment" (subd. (h)). The impound fees and veterinary costs incurred by defendant are covered by these mandatory provisions as a matter of law. Plaintiff did not contest in the trial court the dollar amounts claimed by defendant,[13] only whether defendant was entitled to any amount for these expenses. With the issue of defendant's entitlement now established, the most efficient means of

of subdivision (i) made them "abandoned" by plaintiff and available to be "disposed of" by defendant. Whatever happened thereafter to the animals could not form the basis for damages.

Defendant does point out that plaintiff could have tried to get a stay of the hearing officer's decision pending commencement of this lawsuit. (See Code Civ. Proc., § 1094.5, subd. (g).)

[13]In his reply brief, plaintiff argues for the first time that defendant "failed to prove with any degree of specificity the extent or nature of treatment or that the veterinarian services performed were even necessary." Because plaintiff made no such objection to Machado's

closing this matter is to modify the judgment to award defendant the $1,332.50 it requested.

## VI

■ Defendant sought its "standard board fees" amounting to $9,504. The trial court awarded boarding fees on a far more modest scale, accepting those set forth in the Maercks's declaration as more "reasonable." Defendant attacks Maercks's figures on the ground that they are "irrelevant and should have been disregarded" because they "completely lacked any relevant foundation as it was not based on the specific facts and circumstances surrounding the costs incurred by the **Marin Humane Society** in boarding these exotic animals . . . [c]ertainly the Humane Society is the best estimator of the cost of boarding reptiles on its premises." (Original emphasis.) The gist of this argument is evidentiary competency, matters ordinarily affecting the weight of evidence. Any argument concerning the admissibility of that evidence argument would survive for review on appeal only if the record showed that the appropriate objection was made and rejected. (Evid. Code, § 353, subd. (a).) Nothing in the papers filed by defendant includes such an objection and there are no reporter's transcripts of any of the proceedings conducted by the trial court. (See fn. 5, *ante*.) Defendant has thus failed to carry its burden of demonstrating error by an adequate record. (E.g., *Ballard* v. *Uribe* (1986) 41 Cal.3d 564, 574-575 [224 Cal.Rptr. 664, 715 P.2d 624]; 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 518, p. 562.)

The judgment is modified as follows: (1) paragraphs "1)" and "3)" showing that plaintiff is to recover $2,540 "as damages for the loss of his property" and a "net total" of $1,004, respectively, are deleted; and, (2) paragraph "2)" is amended to show that defendant is entitled to recover boarding fees in the amount of $1,536, impound fees in the amount of $420, and veterinary expenses in the amount of $912.50, for a total of $2,868.50. As so modified the judgment is affirmed. The parties shall bear their respective costs.

Hanlon, P. J., and Sepulveda, J., concurred.

A petition for a rehearing was denied April 20, 1999.

---

declaration in the trial court, the merits of plaintiff's argument have not been preserved for appeal. (Evid. Code, § 353, subd. (a).)