Filed 9/8/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>       v.<br><br>KEVIN R. WILLIAMS et al.,<br><br>    Defendants and Appellants. | B275226<br><br>(Los Angeles County<br> Super. Ct. No. MA064988) |

APPEAL from an order of the Superior Court of Los Angeles County. Eric P. Harmon, Judge. Affirmed.

Allison H. Ting, under appointment by the Court of Appeal, for defendant and appellant Kevin R. Williams.

James M. Crawford, under appointment by the Court of Appeal, for defendant and appellant Pauline R. Winbush.

Kamala D. Harris and Xavier Becerra, Attorneys General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and Tannaz Kouhpainezhad, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \* \* \* \* \*

Pursuant to a plea agreement, defendants and appellants Kevin R. Williams and Pauline R. Winbush were each convicted of one felony count of dog fighting, and one felony count of animal cruelty. The sole issue on appeal is defendants' contention the court erred in denying their joint motion to suppress evidence and to quash and traverse the warrant pursuant to Penal Code section 1538.5.

We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

On February 17, 2015, defendants Williams and Winbush were charged by information with 29 separate counts, including four felony counts of possession of fighting dogs (Pen. Code, § 597.5, subd. (a)(1); counts 1-4), and 17 counts of animal cruelty (Pen. Code, § 595, subd. (b); counts 5-21).

Defendants jointly filed a motion to suppress evidence seized during the search of their residential property on November 26, 2014, and to quash and traverse the warrant pursuant to Penal Code section 1538.5. The People filed opposition. The motion was heard on October 7 and 26, 2015, and concluded on November 18, 2015. We summarize the material facts as reflected in the testimony received at the hearing.

Just before 3:00 p.m. on October 29, 2014, Ed Callaway, a field officer with the Los Angeles County Department of Animal Control (Animal Control), responded to a report of a loose horse near the 7000 block of West Avenue A-14 in an unincorporated rural area of Los Angeles county, near Lancaster. When he arrived on the scene and saw the wandering horse, he saw a car swerve to avoid hitting it, and several other cars in the vicinity.

Officer Callaway approached the horse, trying not to frighten it out into traffic, but the horse headed back down

2

Avenue A-14.  He followed the horse slowly in his vehicle until the horse stopped at the property located at 7038 West Avenue A-14 (property later determined to be defendants' residence).  The horse attempted to reenter the property through a side fence near where there was some sort of corral.  Officer Callaway noticed there were several broken or loose boards in the fence, and presumed the horse had gotten loose from there.  The horse was unable to get back into the yard.

As the horse continued to try to push through the fence, Officer Callaway heard several dogs begin to bark.  He walked along the outside of the fence toward the horse to try to determine if the dogs were loose and could frighten or injure the horse, or chase it back out onto the street where it would be a serious hazard.  Officer Callaway saw that the dogs were confined in "makeshift" kennels of chain link fencing and plywood inside the yard.

The dogs continued barking, and the horse walked back toward the front of the property.  The horse stopped near the driveway that led up to the garage attached to the home.  There was an open gate in a chain link fence that abutted the side of the garage.  The fence was about three feet high.  The horse went through the gate but appeared to have difficulty getting into the back yard due to debris and weeds.  It retreated back out to the front yard and began to eat some weeds or spilled hay on the ground near the garage.  Officer Callaway moved his vehicle and parked it in a location near the driveway, hoping to block the horse from leaving that portion of the front yard.  Officer Callaway then walked through the open gate into the back yard to see if there was a suitable corral, that did not have broken fencing, in which to safely secure the horse.  He could not see any suitable corral and returned to the front yard.

3

Officer Callaway called Sergeant Rachel Montez-Kemp, also of Animal Control, and told her he needed a trailer to impound a loose horse. While he waited for her to arrive, he yelled into the yard announcing his presence in case the property owner was out back. He also honked the horn of his vehicle. He got no response. Sergeant Montez-Kemp arrived about 20 minutes later with a horse trailer.

Once Sergeant Montez-Kemp arrived, they haltered the horse and placed it inside the horse trailer. The horse looked "thin." Sergeant Montez-Kemp had brought a bucket of feed, so they left the horse eating inside the trailer while they attempted to determine if the owner was at home. Sergeant Montez-Kemp has worked for Animal Control for 16 years and the department's normal procedure is to attempt to make contact with an owner of livestock before impounding an animal. Officer Callaway, who had seven years of experience, confirmed that was the department's practice.

Sergeant Montez-Kemp knocked on the front door of the home. No one answered, but she heard the distinctive sound of puppies barking from inside the home. She also knocked on the front window of the home and the garage door but got no response. Sergeant Montez-Kemp told Officer Callaway to call dispatch to attempt to call the property owners. Dispatch left a message on an answering machine after no one picked up the phone.

They heard several dogs barking in the back yard, as well as a dog barking and "whining" from inside the garage. There was a strong smell of "excessive" fecal matter. Officer Callaway looked through a broken window in the upper corner of the garage door. There was a dog inside, in conditions that appeared "unhealthful." Officer Callaway also saw a treadmill and a "slat

4

mill" partially covered by a tarp. A slat mill is a device used in the training of fighting dogs. Officer Callaway said he was six feet one inch tall, but was a couple of inches taller in his work boots, and was able to look into the window of the garage door.[1]

Sergeant Montez-Kemp thought if the owner was out in the back yard, the noise from the barking dogs could make it difficult to hear them knocking and yelling out front. Both she and Officer Callaway walked through the open gate near the garage into the back yard.[2] Officer Callaway looked into the window at the back of the garage, as did Sergeant Montez-Kemp.

While in the back yard, Sergeant Montez-Kemp confirmed the corral with the broken boards was not suitable for the horse as it could plainly escape again and get injured or be a danger to motorists. They walked a little further into the back yard toward the kennels. She noticed that all of the dogs on the property in makeshift kennels were pit bulls, the breed most often used in dog fighting. One of the dogs had a missing lip, and another smaller female pit bull had multiple scars on her body. Another kennel contained a dog with a litter of puppies. They saw no one in the back yard.

---

[1] During cross-examination, Officer Callaway conceded he wrote his report about the incident several weeks later. Because Animal Control is understaffed, he often has to delay writing incident reports in order to handle more urgent matters. He conceded he did not include anything in his written report about entering the back yard of the property or hearing the whining dogs, because the focus of his report was documenting the impounding of the loose horse.

[2] Sergeant Montez-Kemp confirmed, on cross-examination, that she and Officer Callaway walked into the back yard together after the horse was secured on the trailer.

Sergeant Montez-Kemp was familiar with defendants' property as she had been called out to the property on prior occasions, including in February 2008 on a report of excessive dogs on the property and "possible dog fighting." At that time, she found approximately 30 pit bulls on the property but defendants claimed to have the requisite permits or were in the process of obtaining them. No further action was taken. She was also aware that another Animal Control officer had been called to the property in 2010 due to a report regarding horses that were "thin" or in poor condition. The officer who responded to the property in 2010 reported numerous pit bulls were kept in kennels filled with excrement and water bowls containing mold and algae. Sergeant Montez-Kemp testified she was experienced in "blood sports" and had investigated dozens of animal fighting cases in her career.

Sergeant Montez-Kemp instructed Officer Callaway to take several photographs at the property, including the interior of the garage through the back window, and also from the window in the front garage door because he was taller than she was. Sergeant Montez-Kemp said Officer Callaway was able to see into, and take a photograph of, the interior of the garage from the broken front window without standing on anything. Sergeant Montez-Kemp also took some photographs of the kennels in the back yard.

Sometime around 5:00 p.m., defendant Williams arrived home. He told Officer Callaway the horse got loose all the time and he was unable to keep it locked up. Officer Callaway issued defendant a misdemeanor citation and impounded the horse.

The next day, Sergeant Montez-Kemp sent Deputy Robert Ferrell of the Los Angeles County Sheriff's Department an email about the events of October 29. She provided him copies of the

photographs she and Officer Callaway had taken on October 29, 2014. Sergeant Montez-Kemp told Deputy Ferrell she suspected defendants were operating a "dog fighting operation" at their property.

On November 10, 2014, Deputy Ferrell and Sergeant Montez-Kemp went to defendants' property and drove around the perimeter from outside the fence. Deputy Ferrell noted two different sets of individual dog kennels. On at least two sides of the property, the fencing was "low" so the kennels were visible from the road, but he could not see the dogs inside. Deputy Ferrell confirmed he and Sergeant Montez-Kemp never entered defendants' property on November 10, but only observed, and took photographs of, the property and kennels from the public roads outside of the fencing.

Deputy Ferrell testified he prepared his affidavit in support of the search warrant based on the written and oral reports received from Sergeant Montez-Kemp, as well as his personal observations on November 10, 2014. Deputy Ferrell explained he had 26 years of experience as a deputy sheriff and is a certified court expert in the field of "bloodsports" and illegal animal fighting. Because he knew Sergeant Montez-Kemp to be experienced in blood sport investigations, her report and statements of her observations were credible to him. He understood from Sergeant Montez-Kemp that the horse had been secured in the trailer, when she and Officer Callaway proceeded into the back yard and eventually took the photographs. He agreed her photographs of the kennels appeared to be taken "up close" as compared to his photographs taken from outside the fence.

Deputy Ferrell's affidavit identified his experience, as well as Sergeant Montez-Kemp's experience, with blood sport

investigations. It summarized the observations made at the property by Sergeant Montez-Kemp and Officer Callaway on October 29, as well as the prior calls to the property. It further set forth the information concerning Deputy Ferrell's trip to defendants' property on November 10, with Sergeant Montez-Kemp, in which he confirmed the presence of the kennels. The affidavit stated, in part, that based on the breed of dog being kept on the property, "the training devices observed, and the condition in which the dogs are housed (fighting dogs used in bloodsports are kept either on individual chains or in kennels spaced closely enough to see and get near each other, but always just out of each other [*sic*] reach) coupled with my observations of the location and my training and experience in bloodsports," it was his belief that evidence of an illegal dog fighting operation would be found on the property.

The search warrant issued November 24, 2014 and was served and executed on November 26, 2014. The officers recovered 19 pit bulls (11 adults and 8 puppies), many of which were emaciated or had sores or scars. They also recovered numerous other dead animals, as well as the slat mill device and three boxes of documents related to dog fighting, among other items.

After the testimony of Deputy Ferrell, Sergeant Montez-Kemp and Officer Callaway was completed, defendants called Pasquale DiFabrizio to testify. Mr. DiFabrizio is a private investigator hired by defendants. He attested to the information in his report documenting the conditions on the property. He said he attempted to duplicate the photographs taken by Officer Callaway on October 29, and could only obtain similar photographs of the kennels if he was inside the back yard right next to the kennels, as they are approximately 80 feet into the

middle portion of the back yard from the chain link fence near the garage. He stated the back yard of defendants' property is fully fenced with a mixture of chain link and wood boards. Mr. DiFabrizio confirmed there are windows on the front garage door, one of which is broken. The bottom edge of that window is approximately 5 feet 11 inches from the ground. Mr. DiFabrizio said he is six feet tall but could not take a photograph of the interior of the garage from that window without holding the camera over his head.

After entertaining extensive argument, the court denied defendants' motion.

Thereafter, defendants each pled no contest to one count of possession of fighting dogs (Pen. Code, § 597.5, subd. (a)(1)), and one count of animal cruelty (§ 597, subd. (b)).

The court sentenced each defendant to county jail for a term of three years eight months. The court suspended execution of sentence and placed both defendants on five years of formal probation on the condition that defendant Williams serve 365 days in county jail, and defendant Winbush serve 270 days in county jail. Defendants were ordered to take animal cruelty classes and were prohibited for owning or residing with any animals during the probationary period. The remaining counts were dismissed in accordance with the plea agreement.

This appeal followed.

## DISCUSSION

Defendants contend the trial court erred in denying their motion to suppress and to quash and traverse the warrant. They argue the Animal Control officers' entry onto their property was unlawful because they did not have a warrant and there were no exigent circumstances. Defendants argue that to the extent the loose horse created an emergency, it ended as soon as the horse

9

was secured in the trailer and there was no reasonable basis for the officers to continue their search into the back yard. Defendants contend the subsequent search and seizure of evidence pursuant to a warrant was the tainted fruit of the initial unconstitutional entry, and neither the independent source rule nor the good faith exception apply.  When the tainted material is excised from the warrant, defendants contend it does not support a finding of probable cause.  We disagree.

In reviewing an order denying a motion to suppress pursuant to Penal Code section 1538.5, we "uphold those factual findings of the trial court that are supported by substantial evidence." (*People v. Camacho* (2000) 23 Cal.4th 824, 830 (*Camacho*).)  We independently review the question whether the challenged search conformed to constitutional standards of reasonableness.  (*Ibid.*)  Our review is governed by federal constitutional standards.  (*People v. Rogers* (2009) 46 Cal.4th 1136, 1156, fn. 8 (*Rogers*); *People v. Chung* (2010) 195 Cal.App.4th 721, 727 (*Chung*).)

It is fundamental that the Fourth Amendment only protects from unreasonable searches "those areas in which a person has a reasonable expectation of privacy."  (*People v. Chavez* (2008) 161 Cal.App.4th 1493, 1499 (*Chavez*).)  Plainly, a private home is a place in which an individual has a reasonable expectation of privacy.  (*Camacho, supra,* 23 Cal.4th at p. 831.)  Land or structures immediately adjacent to and intimately associated with one's home, referred to as "curtilage," are ordinarily considered part of the home itself for Fourth Amendment purposes.  (*Oliver v. United States* (1984) 466 U.S. 170, 180.)  The Supreme Court identified four factors relevant to deciding whether a given area constitutes curtilage:  "the proximity of the area claimed to be curtilage to the home,

whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." (*United States v. Dunn* (1987) 480 U.S. 294, 301.)

However, not every warrantless entry to the curtilage of a home offends the Fourth Amendment. The protection afforded one's home by the Fourth Amendment " 'has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares. Nor does the mere fact that an individual has taken measures to restrict some views of his activities preclude an officer's observations from a public vantage point where he has a right to be and which renders the activities clearly visible. [Citation.] "What a person knowingly exposes to the public, even in his own home . . . , is not a subject of Fourth Amendment protection." ' " (*Camacho*, *supra*, 23 Cal.4th at p. 831.)

" ' "It is clear that *police with legitimate business may enter areas of the curtilage which are impliedly open, such as access routes to the house*." ' " (*Chavez*, *supra*, 161 Cal.App.4th at p. 1500, italics added.) " 'A sidewalk, pathway, common entrance or similar passageway offers an implied permission to the public to enter which necessarily negates any reasonable expectancy of privacy in regard to observations made there. The officer who walks upon such property so used by the public does not wear a blindfold; the property owner must reasonably expect him to observe all that is visible. In substance the owner has invited the public and the officer to look and to see.' " (*Chavez*, *supra*, 161 Cal.App.4th at p. 1500.)

It is undisputed that on October 29, 2014, Officer Callaway entered the unfenced front yard of defendants' property for a

11

legitimate purpose. Officer Callaway responded to a report of a loose horse on the road, a horse which it is undisputed belonged to defendants.[3] Defendants' front yard and driveway were not fenced off and were publicly accessible. Officer Callaway's actions, including briefly walking through the open gate to see if there was a safe corral, were reasonable attempts to secure the loose horse and determine if there was a suitable corral on the property. His conduct did not constitute a search under the Fourth Amendment.

Once Sergeant Montez-Kemp arrived with the horse trailer and secured the horse inside, she and Officer Callaway made further efforts to make contact with defendants before hauling the horse away. It was reasonable for the officers to make a genuine effort to contact the property owner before formally impounding the horse. Knocking on the front door, a front window to the home, and the front garage door while calling out to see if anyone was home were reasonable tactics in that regard and did not offend the Fourth Amendment.[4]

Defendants primarily take issue with the conduct of the officers that occurred thereafter on October 29, 2014, namely looking into the windows of the attached garage and walking into and inspecting the fenced back yard. Defendants contend there

---

[3] Los Angeles County Code section 10.32.040 makes it a misdemeanor to allow one's livestock to be loose on public land or roads. The citation issued to defendant Williams was for a violation of this ordinance.

[4] As defendants apparently concede, no Fourth Amendment issue was raised by any of the actions on November 10, 2014, when Deputy Ferrell returned with Sergeant Montez-Kemp and made observations of the property solely from public vantage points outside the fence.

was no longer any emergency as the horse was in the trailer and no longer presented a hazard, and their activities were motivated solely by the fact Sergeant Montez-Kemp was on "a mission of ferreting out" evidence of a crime.

Respondent contends the conduct of the officers was justified by exigent circumstances. We agree.

"[T]he exigent circumstances doctrine constitutes an exception to the warrant requirement when an emergency situation requires swift action to prevent imminent danger to life." (*Rogers*, *supra*, 46 Cal.4th at p. 1156.) The exigent circumstances exception is properly invoked when "an officer reasonably believes an animal on the property is in immediate need of aid due to injury or mistreatment." (*Chung*, *supra*, 195 Cal.App.4th at p. 732; accord, *Broden v. Marin Humane Society* (1999) 70 Cal.App.4th 1212, 1222.)

There is no " ' " 'litmus test' " ' " for determining whether exigent circumstances exist. (*Rogers*, *supra*, 46 Cal.4th at p. 1157.) " ' " '[I]n each case the claim of an extraordinary situation must be measured by the facts known to the officers.' " ' [Citation.] Generally, a court will find a warrantless entry justified if the facts available to the officer at the moment of the entry would cause a person of reasonable caution to believe that the action taken was appropriate." (*Ibid*.)

In *Chavez*, an officer took a report from a woman that her boyfriend, who had previously been violent with her, had forcibly taken her car. (*Chavez*, *supra*, 161 Cal.App.4th at p. 1497.) She told the officer she was scared of her boyfriend, was not certain where their seven-year-old son was, and she had seen a gun at their home about six months earlier. (*Ibid*.) The officer went to the family home, felt the front grill of the car parked in the driveway and noticed it was warm. He therefore assumed the

13

boyfriend was inside. He knocked several times on the front door, rang the doorbell, and called out his presence, but got no response. (*Ibid*.) He then walked a few steps down a cement walkway to a six-foot wooden gate, and looked over. The officer noticed a gun lying on the ground near a sliding door that led into the home. Fearing for the safety of the boy in case he was inside the home, the officer jumped over the fence to retrieve the gun, and then jumped back over the fence. (*Ibid*.)

In reversing the trial court's grant of the defendant's motion to suppress, the *Chavez* court explained, "the officer's observation of the revolver was not a search because the revolver was viewed in plain sight. . . . Defendant's fence, at approximately six feet tall, prevented only physical intrusion and not observations by persons approximately six feet or taller. . . . Such a fence does not prevent viewing . . . in many other circumstances such as from an adjacent deck, back yard improvement, play set, children's tree house, or neighbor's second-story window." (*Chavez, supra*, 161 Cal.App.4th at p. 1501, citations omitted.)

*Chavez* further held that exigent circumstances justified the officer briefly jumping over the fence to secure the revolver. "By jumping the fence into defendant's side yard to secure the revolver, [the officer] acted reasonably under the circumstances to protect both himself and the child he had reason to believe was in the residence. . . . He did not conduct any further search while in the yard and instead did no more than was necessary to eliminate the risk posed by the gun." (*Chavez, supra*, 161 Cal.App.4th at p. 1503.)

Here, a horse that was thin and being housed in an unsafe corral had escaped from defendants' property. Officer Callaway and Sergeant Montez-Kemp knew there had been prior calls to

the property in response to reported concerns about the conditions of horses and pit bulls on the property. Sergeant Montez-Kemp heard puppies barking inside the home when she knocked on the door trying to contact defendants, and Officer Callaway heard a dog whining from inside the garage. There were strong odors of excessive fecal matter reasonably associated with unhealthful housing conditions.

Under those circumstances, it was reasonable for Officer Callaway and Sergeant Montez-Kemp to be concerned there was a dog in distress inside the garage and possibly in need of immediate aid. There was nothing unreasonable about Officer Callaway standing on the front driveway and simply looking through the broken window in the garage door to determine whether the dog he heard making a whining bark was in genuine distress. Such facts "would cause a person of reasonable caution to believe that the action taken was appropriate." (*Rogers*, *supra*, 46 Cal.4th at p. 1157.)

Moreover, Officer Callaway's conduct, like the officer in *Chavez*, was " 'strictly circumscribed by the exigencies which justif[ied] its initiation.' " (*Mincey v. Arizona* (1978) 437 U.S. 385, 393.) He did not thereafter enter the garage or intrude further inside. He only looked inside to determine if the dog needed to be assisted. From that vantage point, the treadmill and partially covered slat mill device were plainly visible inside the garage.

Defendants argue that Officer Callaway and Sergeant Montez-Kemp did not find any animals in immediate threat of injury or death, either inside the garage or in the back yard, and in fact ultimately waited several weeks to return with law enforcement, and a warrant, to impound the dogs on the property. Defendants suggest this is proof there was no emergency justifying their conduct. We are not persuaded.

15

The exigent circumstances doctrine protects reasonable law enforcement conduct. Officer Callaway acted reasonably in looking inside the garage window to attempt to determine the conditions of the dog he heard inside. Simply because the dog, while living in unhealthful conditions, did not appear to be in immediate risk of death, does not mean exigent circumstances did not justify Officer Callaway's decision to look inside. (*People v. Troyer* (2011) 51 Cal.4th 599, 606 [the possibility that injury or death may be prevented by immediate action "outweighs the affront to privacy" when an officer makes a warrantless entry "under the reasonable but mistaken belief that an emergency exists"].)

Defendants argue there were no circumstances that justified the officers proceeding into the back yard after having looked in the garage. Given the facts known to the officers, it was not unreasonable for them to be concerned about the condition of the dogs they could hear barking incessantly from the back yard. They could have reasonably believed they were justified to walk into the back yard and briefly check on the dogs in the kennels that were visible from outside the fence.

 Even assuming that Officer Callaway and Sergeant Montez-Kemp's decision to walk into the back yard and inspect the kennels was *not* justified by exigent circumstances, the warrant was nonetheless valid. Deputy Ferrell's affidavit contained substantial information supporting a finding of probable cause, even without the information obtained by Officer Callaway and Sergeant Montez-Kemp's search of the back yard on October 29, 2014.

We begin with the well-established principle that an affidavit of probable cause in support of a search warrant is presumed valid. (*People v. Scott* (2011) 52 Cal.4th 452, 484.)

16

Moreover, "[t]he showing required in order to establish probable cause is less than a preponderance of the evidence or even a prima facie case." (*People v. Carrington* (2009) 47 Cal.4th 145, 163.)

After excising the information provided to Deputy Ferrell by Sergeant Montez-Kemp that was obtained from her observations of the kennels while in the back yard (specifically the injuries and scarring to the dogs in the kennels), Deputy Ferrell's affidavit contained the following information: (1) Deputy Ferrell was a certified expert in blood sport investigations; (2) Deputy Ferrell personally observed, from the public roadway, the individual dog kennels located on defendants' property that were of a type used to house fighting dogs; (3) Sergeant Montez-Kemp was an experienced Animal Control officer with expertise in illegal dog fighting operations; (4) defendants' property had been the source of numerous calls over the previous four years regarding pit bulls on the property and an illegal dog fighting operation had been suspected but not confirmed; (5) on October 29, 2014, Sergeant Montez-Kemp and Officer Callaway had to secure and impound a horse that escaped from unsafe housing from defendants' property; and (6) on October 29, 2014, after securing the horse, a slat mill device used in the training of fighting dogs was observed on the property.

This information, without more, was sufficient for the search warrant to issue. "[L]aw enforcement officers may draw upon their expertise to interpret the facts in a search warrant application, and such expertise may be considered by the magistrate as a factor supporting probable cause." (*People v. Nicholls* (2008) 159 Cal.App.4th 703, 711.) Deputy Ferrell's experience allowed him to explain the significance of the dog breed (pit bulls) and the type of kennels on defendants' property

17

as related to a possible dog-fighting operation.  Combined with the balance of information provided, including the prior calls to defendants' property, there was ample information, given Deputy Ferrell's expertise in bloodsports, demonstrating probable cause, even without the information about the injuries and scarring on the dogs in the back yard.

We reject defendants' contention the information from Sergeant Montez-Kemp about prior calls made to defendants' property were stale and not properly considered in determining probable cause.  "No bright-line rule defines the point at which information is considered stale.  [Citation.]  Rather, 'the question of staleness depends on the facts of each case.'  [Citation.]  'If circumstances would justify a person of ordinary prudence to conclude that an activity had continued to the present time, then the passage of time will not render the information stale.' [Citation.]"  (*People v. Carrington*, *supra*, 47 Cal.4th at pp. 163-164.)  The calls at issue spanned approximately a four-year period of time during which defendants were known to be keeping, and apparently breeding, numerous pit bulls on their property.  It was not unreasonable for that information to be considered relevant to the possible existence of an ongoing dog-fighting operation on defendants' property.

Defendants have failed to show the affidavit contained any material omissions that were deliberately made to create a false impression or with reckless disregard for the truth.  (*People v. Scott*, *supra*, 52 Cal.4th at p. 484.)

## DISPOSITION

The order denying defendants and appellants' motion to suppress evidence and to quash and traverse the warrant is affirmed.

Defendant and appellant Kevin R. Williams' judgment of conviction is affirmed.

Defendant and appellant Pauline R. Winbush's judgment of conviction is affirmed.

GRIMES, J.

WE CONCUR:

RUBIN, Acting P. J.

FLIER, J.